UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

**GRAYWOOD RETIREMENT, LLC**  :  **CASE NO. 2:22-CV-03191**

**VERSUS**  :  **JUDGE JAMES D. CAIN, JR.**

**FIREMAN'S FUND INSURANCE COMPANY**  :  **MAGISTRATE JUDGE LEBLANC**

### MEMORANDUM RULING

Before the Court is a Motion for Summary Judgment (Doc. 21) filed by the Defendant, Fireman's Fund Insurance Company ("FFIC"). The Plaintiff, Graywood Retirement, LLC ("Graywood"), opposes the motion. Doc. 26. Also before the Court is a Motion for Partial Summary Judgment filed by Graywood. Doc. 23. FFIC opposes the motion. Doc. 27. Because the motions raise similar issues regarding coverage, the Court will consider them concurrently.

### BACKGROUND INFORMATION

Graywood is the owner of "The Verandah at Graywood" (the Verandah), a retirement, assisted living, and memory care community located in Lake Charles, Louisiana. Doc. 23-1 at ¶ 1. At all times relevant to this lawsuit, the Verandah was insured by FFIC under Policy No. USC020537200 ("the policy"). *Id.* at ¶ 2. The Verandah sustained extensive damage as a result of Hurricane Laura, which made landfall on August 27, 2020. *Id.* at ¶¶ 3-4. To date, FFIC has paid more than $14,000,000.00 for damages under Graywood's Hurricane Laura claim after the application of the Named Storm Deductible contained in the policy. Doc. 21-2 at ¶ 3. Graywood alleges that some of the

temporary roofing materials installed after Hurricane Laura were impacted by weather events, causing additional damages that would not have occurred but for Hurricane Laura. Doc. 1-2 at ¶ 21.  Further, Graywood alleges that because Hurricane Delta struck shortly thereafter on or about October 9, 2020, it is impossible to distinguish which damages were caused by each event. *Id.* at ¶ 22.

Graywood claims that FFIC failed to pay $319,489.06 in additional repair damages, $264,164.85 in additional mitigation expenses, and $546,557.82 for necessary costs to make "unit turn repairs" for each vacated housing unit despite providing satisfactory proof of loss. *Id.* at ¶¶ 23- 24, 26, 31-32, 36.  Graywood also states that it sustained damage to landscaping, including the loss of seventy trees with a replacement cost of $75,900.00, for which FFIC has denied coverage despite presenting satisfactory proof of loss.  *Id.* at ¶¶ 37, 39, 40-41.  Graywood also claims that FFIC improperly applied a second "Named Storm Deductible" after Hurricane Delta for damages attributable or which would not have occurred but for Hurricane Laura. *Id.* at ¶ 27.

Graywood alleges that FFIC breached its contract of insurance and has failed to timely pay for damages under the policy as required by Louisiana Revised Statute § 22:1892 and has acted in bad faith pursuant to Louisiana Revised Statute § 22:1973. *Id.* at ¶¶ 42-47.  Graywood seeks all amounts due under the policy, statutory penalties, costs, and attorney's fees. *Id.* at 9.  FFIC denies that it breached the insurance contract and states: (1) a "Named Storm Deductible Endorsement" applies under the policy, (2) Hurricane Laura and Hurricane Delta are separate "loss events," (3) the policy only covers "direct physical loss or damage," (4) indirect losses or consequential losses are not covered, and (5) no

coverage exists for the replacement of landscaping caused by wind, storm, or hurricanes. Doc. 8 at 2-7.  Further, FFIC states that it acted reasonably and in good faith in connection with the adjustment of Graywood's claims in accordance with the terms of the policy. *Id.* at 8.

FFIC moves for summary judgment dismissal of Graywood's claims arguing that the amounts sought either fall outside the scope of coverage, fail to exceed the stated deductibles, or are subject to an exclusion, and further, any claims under Louisiana's bad faith statutes should be dismissed because FFIC reasonably interpreted the policy.  Doc. 21-1 at 5.  Graywood moves for partial summary judgment requesting that the Court find that its claims for "unit turn repairs" and tree replacement are covered under the language of the policy.  Doc. 23-2 at 5.

**SUMMARY JUDGMENT STANDARD**

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party is initially responsible for identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). He may meet his burden by pointing out "the absence of evidence supporting the nonmoving party's case." *Malacara v. Garber*, 353 F.3d 393, 404 (5th Cir. 2003).  The non-moving party is then required to go beyond the pleadings and show that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To this end he must submit "significant probative evidence" in support of his claim. *State*

*Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

A court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The court is also required to view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000). Under this standard, a genuine issue of material fact exists if a reasonable trier of fact could render a verdict for the nonmoving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

## LAW AND ANALYSIS

### I. Governing Law

Under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), a federal court sitting in diversity jurisdiction applies the substantive law of the forum state. *Cates v. Sears, Roebuck & Co.*, 928 F.2d 679, 687 (5th Cir. 1991). Louisiana law provides that an insurance policy is a contract and that its provisions are construed using the general rules of contract interpretation in the Louisiana Civil Code. *Hanover Ins. Co. v. Superior Labor Svcs., Inc.*, 179 F.Supp.3d 656, 675 (E.D. La. 2016). The words of the policy are given their generally prevailing meaning and "interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." *Coleman v. Sch. Bd. of Richland Par.*, 418 F.3d 511, 516–17 (5th Cir. 2005) (citing La. Civ. Code arts. 2047, 2050). "When the words of an insurance contract are clear and explicit and lead to no absurd consequences,

no further interpretation may be made in search of the parties' intent and the courts must enforce the contract as written." *Sims v. Mulhearn Funeral Home, Inc.*, 956 So.2d 583, 589 (La. 2007) (citing La. Civ. Code art. 2046). Ambiguities in the policy must be construed against the insurer and in favor of coverage. *Coleman*, 418 F.3d at 517. The court resolves an ambiguity by asking "how a reasonable insurance policy purchaser would construe the clause at the time the insurance contract was entered." *Id.* The insured bears the burden of proving that a claim falls within the policy's coverage. *IberiaBank Corp. v. Illinois Union Ins. Co.*, 953 F.3d 339, 346 (5th Cir. 2020); *Doerr v. Mobil Oil Corp.*, 774 So.2d 119, 124 (La. 2000). However, the insurer bears the burden of proving that policy limits or exclusions apply. *Tunstall v. Stierwald*, 809 So.2d 916, 921 (La. 2002); *Coleman*, 418 F.3d at 517.

II.   Application

    A.   **Whether additional damages were caused by a separate loss event**

FFIC maintains that Hurricane Laura and Hurricane Delta are separate loss events under the terms of the policy and cannot be considered part of the same loss event under any reasonable reading of the policy. Doc. 21-1 at 21. FFIC also argues that because the two hurricanes are separate loss events, all claims related to Hurricane Delta are subject to their own separate Named Storm Deductible of $1,258,143.00. *Id.* at 22. Graywood maintains that it should not be subjected to a second deductible because the additional damage, caused by several subsequent weather events, would not have occurred but for the unrepaired damage to structures caused by Hurricane Laura, and as such should be covered under the same loss event. Doc. 26 at 13-14. Graywood also argues that there is no

conclusive evidence that the additional damages were caused by Hurricane Delta and not rain events occurring in between the two hurricanes. *Id.* at 15.

The policy includes a "Named Storm Deductible Endorsement," which contains the following relevant provisions:

> A. Named Storm Deductible
>> 1. The Named Storm Deductible(s) … supersedes any other deductible contained elsewhere in this Policy but only with respect to covered property damage loss or time element loss caused by or resulting from a named storm. . .
>>
>> 2. The Named Storm Deductible(s) … applicable to this Endorsement applies to each loss event…
>> …
>
> B. Named Storm Deductible – Property Damage Loss
>> …
>> 2. If the deductible stated in the Declarations applicable to this Endorsement is a Percentage Deductible, then for the covered property that has sustained loss or damage, the sum we will subtract from a property damage loss in any one loss event is the indicated percentage multiplied by 100% of the total value of such covered property immediately prior to the loss.[1]

Doc. 21-4 at 84.

The term "named storm" is defined by the policy as follows:

Named Storm means a specific storm system, including hurricane, that has been named by the National Weather Service.

*Id.* at 77.

The policy defines "hurricane" as follows:

> a. Hurricane means a hurricane, typhoon, or tropical cyclone that, as reported or recorded by the National Weather Service:

---

[1] The policy's declaration page contains a 5% Named Storm Deductible, which the parties agree amounts to $1,258,143.00. Doc. 21-4 at 17.

        (1) Has sustained wind speed of 74 miles per hour or greater; or

        (2) Has been declared to be a hurricane.

    b.    Hurricane includes loss or damage to the interior of any covered building or structure or to covered property located inside any building or structure which is caused by or resulting from:

        (1) An opening in such building or structure created by the force of a hurricane;

        (2) One or more tornados that are the result of a hurricane;

        (3) Any hail, rain, material, object, or debris that is carried, propelled, or in any manner moved by a hurricane; and

        (4) Any weather condition other than a hurricane, if such loss or damage would not have occurred but for the occurrence of a hurricane.

*Id.* at 75.

The policy also includes a definition of "loss event" as it pertains to hurricanes as well as the occurrence of more than one hurricane as follows:

Loss event means:
a.    With respect to a single hurricane, all elements of loss, regardless of the number of locations involved, caused by or resulting from a hurricane and includes the period of time:

    (1) When a hurricane watch or warning with respect to such hurricane is declared; and

    (2) The entire duration of the hurricane; and

    (3) 72 hours immediately following the reclassification of a hurricane to a lesser storm or named storm;

    as reported or recorded by the National Weather Service (NWS). A single hurricane will constitute a single loss event.

b.    With respect to subsequent hurricanes that cause loss or damage after a hurricane begins as described [] above, all elements of loss,

> regardless of the number of locations involved, caused by or resulting from such subsequent hurricanes that:
>
> (1) Cause loss or damage at your location(s) subsequent to the initial hurricane affecting such location(s); and
>
> (2) Are declared a hurricane before, with respect to the initial hurricane, the expiration of the time period described [] above; and
>
> (3) Occur within the interval of time described [] above, such that assignment of loss or damage to a specific hurricane is not possible
>
> Multiple hurricanes that originate within this defined period of time will constitute a single loss event.

*Id.* at 75-76.

FFIC contends that the additional claims submitted by Graywood, which are the subject of this litigation, were caused by Hurricane Delta and relies on the provisions above to argue that Hurricanes Laura and Delta cannot be considered the same loss event under the policy, noting that it is unquestioned that Hurricane Delta came ashore six weeks after Laura. Doc. 21-1 at 22. As such, FFIC argues that Hurricane Delta was clearly a separate loss event under the language of the policy and a second deductible applies to the additional damages submitted by Graywood. *Id.* Because the application of the second deductible is more than the amount Graywood claims it is owed, FFIC contends that no additional payment is due. *Id.* at 26.

Graywood notes that in between Hurricanes Laura and Delta, there were several weather events that impacted its property, including significant rain events that caused additional damages to their property. Doc. 26 at 7. Graywood also states that during this time only temporary roofing systems were in place, which could not withstand the

intervening weather events, leading to additional damage. *Id.* at 10.  Moreover, Graywood notes that mitigation efforts from Hurricane Laura had not been completed at the time Hurricane Delta arrived. *Id.*  For these reasons, Graywood maintains that the additional damage and mitigation expenses should be included as part of the original claim without a second deductible.

In defining a single loss event for a hurricane, the policy language includes the phrase "caused by or resulting from a hurricane…" Doc. 24-1 at 75.  The policy also states that a "hurricane" includes loss or damage to the interior of a building resulting from any weather condition other than a hurricane if the damage would not have occurred but for the occurrence of a hurricane. *Id.*  As such, loss or damage "caused by or resulting from a hurricane" would include additional damages to the interior of buildings resulting from weather (except a hurricane) that would not have occurred but for the original hurricane.

The policy includes language that attempts to separate damages caused by a successive hurricane into a separate loss event based on a specific period of time, 72 hours after the original hurricane was downgraded to a lesser storm. *Id.* at 76.  However, in practice this clause would require adjustors, contractors, or consultants to specifically delineate each piece of damage as coming from the initial or successive hurricane.  Whether the additional damages or mitigation expenses submitted by Graywood may be considered within the original loss event or as a separate loss event is inherently a fact question contingent on the state of repairs or mitigation of the property when Hurricane Delta struck.  If a portion of the property was not yet repaired after Hurricane Laura and suffered additional damage, that damage should be considered as part of the original loss event.  If

a portion of the property was already fully repaired after Hurricane Laura and then suffered additional damage from Hurricane Delta, that damage should be considered a separate loss event. This fact determination must be based on the evidence provided by the adjusters, consultants, and contractors working at the property. Given the contradictory evidence regarding the state of repairs in the record, the Court finds that genuine issues of material fact remain that must be determined at trial. FFIC's motion will be denied on this issue.

### B. Availability of coverage for "unit turn repairs"

As noted above, one of Graywood's claims concerns a failure by FFIC to pay for the costs associated with restoring the housing units vacated due to Hurricane Laura to prepare them for re-occupancy by new tenants. Doc. 1-2 at ¶ 31. This process includes new paint, new carpet, or other necessary repairs referred to as "unit turn repairs," which are standard within the industry before a new resident moves into an apartment. *Id.* Graywood states that it incurred $546,557.82 in such costs and repairs, which would not have occurred but for the damages caused by Hurricane Laura. *Id.* at ¶ 32. Further, Graywood also notes that all consultants involved with the repair of the Verandah advised them to move everything out of the facility, including all furniture, fixtures, and equipment. Doc. 28 at 3. FFIC moves for summary judgment on this claim, arguing that the "unit turn repairs" did not result from direct physical damage and are otherwise excluded under the policy as consequential damages. Doc. 21-1 at 23-24. Conversely, Graywood moves for a summary judgment finding that the "unit turn repairs" are covered by the policy. Doc. 23-2 at 15-16.

The policy at issue contains the following clause regarding "Property Coverage," stating:

> If a Limit of Insurance for Business Real Property or Business Personal Property is shown in the Declarations, then we will pay for direct physical loss or damage to Property Insured while at a location…caused by or resulting from a covered cause of loss during the Policy Period.

Doc. 21-4 at 26. The policy further defines "covered cause of loss" as follows:

> Covered cause of loss means risks of direct physical loss or damage not excluded or limited in this Coverage Form.

*Id.* at 72.

The policy also contains an exclusionary clause for "consequential losses" and "other indirect losses" as follows:

> Exclusions Applicable to all Coverages:  We will not pay under Property Coverage… for any loss, damage, or expense caused directly or indirectly by or resulting from any of the following excluded causes of loss:
> ….
> Consequential Loss, Loss of Market, and Other Indirect Losses
>
> (1) Delay, loss of use, loss of market, loss of occupancy;
>
> (2) Suspension, lapse, or cancellation of any contract;
>
> (3) Delay in completion of contract terms or noncompliance with contract terms or conditions;
>
> (4) Any guarantee or warranty (express or implied);
>
> (5) Loss of Bonuses, fines, penalties, or liquidated damages; or
>
> (6) Any other consequential, indirect, or remote loss of any kind.

*Id.* at 27-28.

Upon review, the Court concludes that "unit turn repairs" are not covered under the plain language of the policy. The policy limits coverage to "direct physical loss or damage … caused by or resulting from a covered cause of loss." *Id.* at 26. The costs associated with preparing a unit for lease to another tenant are not in the nature of a direct physical loss or damage. The "unit turn repairs" are indirect expenses caused by Hurricane Laura, which are not covered under the policy. However, if in the process of turning over a unit it was discovered that actual physical damage existed from the hurricane, such as water damage, then the repair associated with that physical damage would be covered under the policy. Accordingly, FFIC's motion will be granted on this question and Graywood's motion will be denied.

### C. Coverage for landscaping

As noted above, one of Graywood's claims centers on the denial of its request for $79,500.00 to replace approximately seventy trees that were destroyed or lost during Hurricane Laura. FFIC moves for summary judgment of this claim, arguing that trees are not covered under the policy. Doc. 21-1 at 24-25. Conversely, Graywood moves for partial summary judgment arguing that coverage is provided under the policy language. Doc. 23-2 at 17.

The policy contains the following relevant language regarding coverage for landscaping:

> III.   Property Not Insured
>
>    This Coverage Form does not insure any of the following property:
>
>    . . .

   C. Growing crops; standing timber; or outdoor trees, shrubs, plants, or lawns: except to the extent such may be specifically provided by Item V.F.6. Outdoor Trees, Shrubs, Plants, and Lawn Coverage in this Coverage Form, if the Declarations show that you have such coverage.

   . . .

 V. Extensions of Coverage

  F. Extensions of Coverage Applicable to Property, Business Income, and Extra Expense Coverages:

   . . .

  6. Outdoor Trees, Shrubs, Plants and Lawn Coverage

   a. (1) We will pay for direct physical loss or damage to your trees, shrubs, plants, and lawns growing and situated outside of covered business real property at a location caused by or resulting from any of the following causes of loss: Aircraft; explosion; fire; lightning; riot or civil commotion; smoke; vandalism or malicious mischief; or vehicles.

    (2) Outdoor Trees, Shrubs, Plants, and Lawn Coverage includes the necessary expense incurred to:
     (a) Trim, remove, replace, replant, or reposition trees, shrubs, plants, or lawns; and
     (b) Cleanup, remove and dispose of the debris of covered trees, shrubs, plants, and lawns;
    anywhere at your location which have suffered covered loss or damage.

Doc. 21-4 at 26, 46-47.

  FFIC argues that the plain language of the statute indicates that coverage is only provided for the enumerated perils contained in paragraph V.F.6.a.(1) – aircraft, explosion, fire, lightening, riot or civil commotion, smoke, vandalism or malicious mischief, or vehicles – not wind, storm, or hurricane damage. Doc. 21-1 at 24. As such, FFIC maintains that the claim was properly denied due to lack of coverage. *Id.* at 25.

Graywood reads subsections V.F.6.a.(1) and (2) as distinct, with each subsection providing an independent basis for coverage. Doc. 23-2 at 17. Specifically, Graywood argues that subsection V.F.6.a.(2) of the policy does not limit the perils covered, and both "named storms" and "hurricanes" are insured perils under the policy. *Id.* Further, Graywood notes that subsection V.F.6.a.(2) provides coverage for the necessary expense incurred to replace trees "anywhere at your location which have suffered a covered loss or damage." Graywood contends that if FFIC wanted to limit the application of V.F.6.a.(2) to the perils identified in V.F.6.a.(1) it should have included words to that effect. *Id.* If there is an ambiguity created between the two paragraphs, Graywood argues that the Court should accept its interpretation as reasonable and in favor of coverage. *Id.*

The Court has examined the policy language in question and finds it to be unambiguous. First, Section III clearly states that landscaping, including trees, are not insured except to the extent coverage is provided under Section V.F.6 – Extensions of Coverage for Outdoor Trees, Shrubs, and Lawn Coverage. Subsection V.F.6.a.(1) provides coverage resulting from a specific list of perils: aircraft, explosion, fire, lightening, riot or civil commotion, smoke, vandalism or malicious mischief, or vehicles. Doc. 21-4 at 47. Subsection V.F.6.a.(2) describes the scope of coverage provided based on the necessary expenses incurred to trim, remove, replace, replant, or reposition trees, and for the cleanup and disposal of debris. *Id.* The Court does not read V.F.6.a.(2) as a stand-alone provision, but rather a delineation of the covered expenses associated with the direct physical loss or damage caused by one of the listed perils – aircraft, explosion, etc. Accordingly, FFIC's motion will be granted as to this claim, and Graywood's motion will be denied.

   D.   **Bad faith claims**

FFIC moves for the dismissal of Graywood's bad faith claims pursuant to Louisiana Revised Statutes §§ 22:1892 and 22:1973, arguing that it can not be held to have acted arbitrarily and/or capriciously with respect to Graywood's claims because it was within its right to refuse payment under the policy. Doc. 21-1 at 25.  FFIC also maintains that it had a reasonable basis for its coverage positions, which precludes a finding of bad faith. *Id.* Graywood counters that summary judgment should not be granted because factual determinations remain underlying the reasonableness of FFIC's refusal to pay. Doc. 26 at 19-20.  The Court agrees with Graywood that genuine issues of material fact remain for trial with respect to its claims for bad faith damages concerning FFIC's refusal to pay Graywood's additional damage and mitigation expenses.  Accordingly, FFIC's motion to dismiss these claims will be denied at this time.

## CONCLUSION

Based on the foregoing reasons, the Motion for Summary Judgment filed by FFIC (Doc. 21) will be **GRANTED IN PART** as to the lack of coverage for "unit turn repair" costs and landscaping and will be **DENIED** in all other respects.  Graywood's Motion for Partial Summary Judgment (Doc. 23) will be **DENIED**.

**THUS DONE AND SIGNED** in Chambers on this 31st day of May, 2024.

_____
**JAMES D. CAIN, JR.**
**UNITED STATES DISTRICT JUDGE**